IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 06-00468 JMS |
| | ) | |
| Plaintiff, | ) | ORDER DENYING DEFENDANT'S |
| | ) | MOTION TO SUPPRESS |
| vs. | ) | |
| | ) | |
| JEFFREY D. SLOAN, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Defendant Jeffrey D. Sloan ("Sloan") seeks an order from the court suppressing statements made to law enforcement agents and evidence obtained from a warrantless search of his computer.  On May 7, 2007, the court received oral testimony from United States Army Criminal Investigation Division ("CID") Agent Daniel Wild; Immigration and Customs Enforcement ("ICE") Special Agent Gregorio Perez; United States Army Sergeant Major Merlin Lilienthal; and Joseph Beaty.

After reviewing the motion, the supporting and opposing memoranda, the testimony of the witnesses, and the arguments of counsel, the court DENIES the motion to suppress.

# I.  <u>BACKGROUND</u>

LimeWire is a popular peer-to-peer file sharing program that permits computer users to distribute and receive photographs, videos, and music over the internet.  Once a user installs LimeWire's file sharing software and designates files as being available for sharing, other distant LimeWire users can access and download those files.  Although it is capable of being used for legitimate purposes, LimeWire also permits large-scale dissemination of child pornography.  LimeWire's use for this illegal purpose is the focus of this case.

On December 29, 2005, ICE Special Agent Bruce Law conducted a search using LimeWire to locate individuals involved in the receipt and distribution of child pornography.  In order to conduct this search, Agent Law accessed LimeWire's search function and entered descriptive terms associated with child pornography.  As part of this search, Agent Law located files available for sharing from a LimeWire user associated with Internet Protocol Address ("IP Address") 72.130.200.236.[1]  Agent Law determined that this computer's shared files contained 471 image files, 451 movie files, and 112 music files.  *See*

---

[1] An IP Address, in simple terms, is a unique computer address.  Computers use IP Addresses to identify and communicate with others on a computer network.  Each IP Address identifies the sender or receiver of information sent across the Internet.

Government Ex. 6.[2]  Agent Law downloaded three files that were confirmed to be images of child pornography.[3]

An administrative subpoena issued to Internet Service Provider Time Warner Cable revealed that IP Address 72.130.200.236 was registered to Sloan at 551 E Quad, #319, Schofield Barracks, Hawaii.  Based on this information, including the fact that Sloan was a member of the United States Army, Agent Perez contacted Army CID Agent Wild.[4]

On February 15, 2006, Agent Wild asked Sloan's commander, Captain Adam Kuhn, to arrange for Sloan to be escorted from work to his barracks room.[5]  Captain Kuhn issued the order and Sloan arrived at his barracks, under

---

[2] Agent Perez testifies that some, but not all, of these files had names known to be associated with child pornography.

[3] Joseph Beaty testified that Sloan was in Seattle, not Honolulu, on December 29, 2005. Sloan presented no evidence, however, suggesting that his computer was not connected to the internet on that date.  That Sloan may have been in Seattle does not undermine the testimony concerning the December 29, 2005 LimeWire search.

[4] Agent Wild was removed from the CID after February, 2006 based on misconduct unrelated to this case.  His testimony, in conjunction with an investigation report (Def's. Ex. A), demonstrates that the Army determined that Agent Wild failed to obey a lawful order.  As a result, he received administrative punishment under the Uniform Code of Military Justice Article 15.  Given Sloan's impeachment of Agent Wild, the court has carefully evaluated his testimony and specifically finds that he was credible.  His demeanor appeared to the court as earnest and straightforward.  In short, the court found Agent Wild to be truthful throughout his testimony.

[5] Prior to this point, a military magistrate signed an authorization to search Sloan's barracks room and computer.  It appears, however, that Agent Wild obtained an authorization to search the wrong address, and this authorization was never executed.  It is not clear how this

(continued...)

3

escort.  Although he was not free to leave, Sloan was not physically restrained and he was not placed under arrest.  Agent Wild then took Sloan into a hall, told him that he was under investigation for possession and/or distribution of child pornography, and read him the following rights from Department of the Army Form 3881 ("DA Form 3881")[6]

1.   I do not have to answer any questions or say anything.

2.   Anything I say or do could be used as evidence against me in a criminal trial.

3.   I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning.  This lawyer can be a civilian lawyer I arrange for at no expense to the Government or a military lawyer detailed for me at no expense to me, or both.

4.   If I am now willing to discuss the offense(s) under investigation, without or without a lawyer present, I have a right to stop answering questions at any time, or speak privately with a lawyer before answering further, even if I sign the waiver below.

Government Ex. 2.

---

[5](...continued)
mistake was made, as Sloan was residing, at least on a part-time basis, at 551 E Quad, #319 on Schofield Barracks on February 15, 2006.  In any event, the government is not relying on the military judge's authorization to justify the search of Sloan's computer.

[6] At this time, according to Agent Wild, Captain Kuhn, Agent Perez, and CID Agents Grizzel and Brown were approximately twenty-five feet away.

Sloan told Agent Wild that he was willing to discuss the matter under investigation without an attorney present.  Sloan then signed the DA Form 3881, acknowledging that "I am now willing to discuss the offense(s) under investigation and make a statement without talking to a lawyer first and without having a lawyer present with me."  *Id.*

Next, Agent Wild sought consent to search Sloan's barracks room, wall locker, and vehicle.  Sloan was given a consent to search form, again informing him of the nature of the investigation ("Possession, distribution and/or production of material constituting or containing child pornography").  Government Ex. 4.  Agent Wild also informed Sloan that he could refuse to consent to the search.[7]  Sloan signed the consent to search form at approximately 3:46 p.m., authorizing the search for computers, hard disk drives, and

> [T]ext, graphics, electronic mail messages, and other data including deleted files and folders, containing material related to the sexual exploitation of minors; and/or material depicting apparent or purported minors engaged in sexually explicit conduct; and data and/or information used to facilitate access to, possession, distribution, and/or production of such materials.

*Id.*

---

[7]  In addition to an oral advisement, section 4 of the consent to search form states that,"I have been advised of my right to refuse a search of my person, premises, and property." Government Ex. 4.

5

During the time that Agent Wild provided Sloan with the warnings and obtained the consent to search, he was not physically restrained, threatened, ordered to give a statement or provide consent, and the agents did not display their weapons.  Further, Agent Wild did not tell Sloan that he could obtain a search warrant if Sloan refused to consent to the search.

The search yielded no useful evidence.  During its execution, Sloan told the agents that he had moved his computer to the Beaty residence, also located on military property.  Approximately 15 to 20 minutes after the consent search was completed, Agent Wild met with Sloan at the CID office located on Schofield Barracks.[8]

While at the CID office, Sloan admitted to possession of child pornography.  Agent Wild asked Sloan if the agents could go to the Beaty residence and "seize the computer as evidence" from that residence.  Sloan agreed, although no written consent was obtained.  At approximately 5:19 p.m., Agents Perez and Grizzel accompanied Sloan to 195 Kawelo Court, Unit 102, Helemano Military Reservation to obtain the computer.  Government Ex. 6.  Sloan, who was not restrained, directed Agents Grizzel and Perez to the Beaty home.  Once there,

---

[8] The search of Sloan's vehicle, the last search conducted pursuant to the written consent to search, was completed at approximately 4:21 p.m.  Government Ex. 6.

the agents knocked on the door.  With no answer, Sloan used his keys to open the door.  He then directed the agents to his computer and some recordable CDRs and DVDs.  Agents then seized the computer, recordable CDRs, and a "thumb drive" on Sloan's key chain.  The search was completed at approximately 5:50 p.m. Government Ex. 6.  During this time period, Sloan was cooperative and did not object to the computer's seizure.  The agents neither threatened nor restrained Sloan, and did not have their weapons drawn.

After the computer was seized, Sloan was taken back to the CID office where he provided a written statement to Agents Wild and Perez.  On the last page of this statement, Sloan affirmed that, "I have made this statement freely without hope of benefit or reward, without threat or punishment, and without coercion, unlawful influence, or unlawful inducement."  Government Ex. 4.  This interview began at approximately 6:15 p.m., and concluded at approximately 8:00 p.m.

Agent Wild attempted to obtain a warrant to search Sloan's computer on February 16, 2006.  According to Agent Wild, however, he mistakenly included Sloan's residence, not his computer, as the place to be searched.  As a

result, that search warrant was never executed.[9]  At some point subsequent to

February 16, 2006, agents searched the computer for evidence of child

pornography without the benefit of a search warrant.

## II. ANALYSIS

Sloan first contends that DA Form 3881 failed to adequately inform

him of his *Miranda* rights, and, in any event, he did not make a knowing,

intelligent, and voluntary waiver of his rights.  Next, Sloan claims that his Fourth

Amendment rights were violated when he was arrested without probable cause; the

barracks room, locker and vehicle were searched without voluntary consent; the

Beaty residence was entered without a warrant or voluntary consent; the seizure of

his computer was conducted without a warrant or voluntary consent; and the

search of the computer (after seizure) was conducted without a warrant or

voluntary consent.   The court disagrees, discussing each in turn.

## A.     Sloan Knowingly and Voluntarily Waived his *Miranda* Rights

Before questioning a suspect in custody, law enforcement must

inform that suspect that:  (1) he has the right to remain silent; (2) his statements

may be used against him in court; (3) he has the right to the presence of an

---

[9] Thus, Agent Wild apparently obtained two invalid search warrants during the two-day
course of this investigation.  The government relies on neither in asking this court to find the
searches lawful under the Fourth Amendment.

attorney during questioning; and (4) if he cannot afford a lawyer, one will be appointed for him prior to any questioning. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). This last warning must "make clear that if the arrested party would like to retain an attorney but cannot afford one, the Government is obligated to appoint an attorney for free." *United States v. San Juan-Cruz*, 314 F.3d 384, 388 (9th Cir. 2002). After these warnings are provided, the suspect may knowingly and voluntary waive these rights and make an un-counseled statement to law enforcement.

Even though *Miranda* warnings must clearly convey the required information, agents are not required to mimic the warnings as articulated by *Miranda*. Instead, law enforcement must convey the essential warnings and rights; the inquiry is whether the warnings "reasonably convey" the rights. *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989).

Sloan claims that being informed that he had the right to "a civilian lawyer I arrange for at no expense to the Government or a military lawyer detailed for me at no expense to me, or both" is flawed. He claims that the warning is not sufficiently clear and that "nothing in the form indicates that this military lawyer would promote the defendant's interests over those of the military." Mot. to Suppress at 40. The court rejects both arguments.

The court initially finds that Agent Wild did in fact provide Sloan with his *Miranda* rights and that the rights provided "reasonably conveyed" the warnings required by law.  Sloan was told that he had a right to remain silent; that what he did say could be used as evidence against him in court; that he had a right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present during questioning; and that the lawyer could be a civilian lawyer at his expense or a military lawyer detailed to him at no cost.  Nothing more is required.[10]

After being informed of his rights,  Sloan then knowingly and voluntarily waived those rights.  Agent Wild's testimony established that he was alone with Sloan, did not use any display of force, did not use any coercive tactics to obtain the waiver, and that Sloan was cooperative at all times.

The court likewise finds no infirmity in offering Sloan a military lawyer (as opposed to a civilian lawyer) free of charge.  Without any support, Sloan claims that access to a military lawyer fails to protect the safeguards that *Miranda* provides.  He claims that a military lawyer, unlike a civilian lawyer, may

---

[10] Sloan's reliance on *United States v. Connell*, 869 F.2d 1349 (9th Cir. 1989), is misplaced.  The warnings in *Connell* were found to be "equivocal and open to misinterpretation" because they informed the defendant that a lawyer *may* be appointed to represent him and that he could obtain a lawyer "in accordance with the law."  *Id*. at 1353.  By contrast, Sloan was clearly informed that he could obtain a civilian lawyer at his own expense or "a military lawyer detailed for me at no expense to me, or both."

promote the interests of the Army over those of Sloan.  This argument holds little water.  Lawyers in the United States -- military or otherwise -- are obligated to represent the best interests of their clients, not their employer or the person or entity footing the bill.  A serious claim could not be made that public defenders or Criminal Justice Act attorneys represent the interests of the United States and not their individual clients simply because the United States pays their salaries.  The same is true for an Army lawyer.[11]  The court concludes that *Miranda's* purposes are properly served when a suspect is given access to legal assistance competent to assist him in the questioning.  Sloan was provided, but declined, this access.

Sloan waived his *Miranda* rights at approximately 3:44 p.m.  During the search of his barracks room, and apparently in response to questioning,  Sloan told the agents that he kept his computer at the Beaty residence.  Sometime between approximately 4:36 p.m. and 5:10 p.m., Sloan admitted to possession of child pornography while at the CID office.  Finally, Sloan provided a written statement after being interviewed from approximately 6:15 p.m. until 8:00 p.m.[12]

---

[11] Army Regulation 27-26 sets forth the Rules of Professional Conduct for Army lawyers. As with the American Bar Association Model Code of Professional Conduct, Army lawyers must provide competent, diligent representation on behalf of their clients. Further, when an Army lawyer represents an individual subject to disciplinary action or administrative proceedings, a lawyer-client relationship exists with the individual client, not the Army.  Rule 1.13(g).

[12] Sloan was also questioned on March 3, 2006.  During the argument on this matter, the
(continued...)

11

The *Miranda* warnings given at 3:44 p.m. remained effective through the last

interview on February 15, 2006.  *See United States v. Rodriguez-Preciado*, 399

F.3d 1118, 1129 (9th Cir. 2005) (not necessary to provide fresh set of warnings

when statement provided 16 hours after original warnings); *United States v.*

*Andaverde*, 64 F.3d 1305, 1313 (9th Cir. 1995) (a one day interval between

*Miranda* warnings and waiver and defendant's statement not unreasonable).[13]

Sloan's February 15, 2006 statements are admissible.

The court now turns to Sloan's Fourth Amendment claims.

## B.    Sloan Voluntarily Consented to the Seizure of his Computer and Its Subsequent Search

Sloan raises several Fourth Amendment claims.  First, he alleges that

he was arrested on February 15, 2006 (at the time that he was "escorted" from the

kitchen to his barracks) without probable cause, and that the after-acquired

---

[12](...continued)
United States clarified that it will not offer this statement at Sloan's trial.  As a result, the court denies the motion as to the March 3, 2006 statement as moot.

[13] Although not specifically raised by Sloan, the court finds that the government also demonstrated that Sloan's confessions were voluntary.  "A confession is involuntary if coerced either by physical intimidation or psychological pressure." *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003).  The court examines whether the defendant's will was overborne at the time of the confession, applying a totality of the circumstances test.  *United States v. Crawford*, 372 F.3d 1048, 1060 (9th Cir. 2004) (en banc).  Throughout the events of February 15, 2006, agents did not use intimidation, physical force, improper promises, or threats.  Sloan was not restrained and remained cooperative throughout.  In short, there is no evidence to suggest undue coercion.

evidence is tainted by this illegal arrest.  Second, Sloan claims that he did not

voluntarily consent to the search of his barracks room, and that the after-acquired

evidence is tainted by the illegal search conducted on his barracks room.  Third,

Sloan argues that he did not provide a voluntary consent to the search of the Beaty

house and seizure of his computer.  Last, Sloan claims that the agents could not

search his computer for child pornography absent having obtained a valid search

warrant.  Each of these arguments will be addressed in turn.

### 1.  *Sloan's Arrest Was Based on Probable Cause*

The court must first determine whether Sloan was in custody at the

time he was given his *Miranda* rights on February 15, 2006.  Under the orders of

his commanding officer, Captain Kuhn, Sloan was escorted to his barracks room.

Agent Wild testified that once Sloan arrived at the barracks, he was not free to

leave.  Under these circumstances, the court finds that Sloan was in custody at the

time that he was read his *Miranda* rights.  *United States v. Charley*, 396 F.3d

1074, 1080 (9th Cir. 2005) (the primary inquiry is whether a reasonable innocent

person under the circumstances believed he was free to leave); *United States v.*

*Carrillo*, 902 F.2d 1405, 1411 (9th Cir. 1990) (same).  Accordingly, the court

must determine whether Sloan's warrantless arrest was based on probable cause.

"Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez,* 482 F.3d 1067, 1072 (9th Cir. 2007) *(citing Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  Stated another way, probable cause is present when, "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986).  The Supreme Court has cautioned that probable cause "does not demand any showing that such a belief be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983).  The collective knowledge of all the officers involved in the investigation may be considered, even if all of the information known to the agents is not communicated to the arresting officer. *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007).  Because probable cause is based on a prudent person standard, an agent generally "need not have probable cause for every element of the offense." *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994).  Finally, courts must be mindful that, "[m]ere suspicion, common rumor, or even strong reason to suspect are not enough" to

14

establish probable cause.  *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984)

(*citing Henry v. United States*, 361 U.S. 98, 101 (1959)).[14]

The court concludes that under the totality of the circumstances the

agents had probable cause to arrest Sloan.[15]  At the time of the arrest, they knew

that Sloan was an active duty member of the United States Army, living at 551 E

Quad, #319 on Schofield Barracks.  Thus, they knew that he was living in a

barracks room, not a residential home with other family members.  They also knew

that, as of December 29, 2005, Sloan subscribed to internet service through Time

Warner Cable, and that a computer -- identified by its unique IP address as

connecting to the internet via Sloan's Time Warner account -- possessed and made

---

[14] Absent evidence of wrongdoing by the government, the fact that the agents *could* have done more in its investigation (or made fewer errors), is not relevant to the court's probable cause determination.  *See United States v. Gourde*, 440 F.3d 1065, 1073 n.5 (9th Cir. 2006) (en banc) ("In any event, the benchmark is not what the FBI 'could have' done.").

[15] Sloan was ultimately charged with a violation of 18 U.S.C. § 2252(a)(4), making it unlawful for any person to
> knowingly possess[ ] 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if--
>> (i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
>> (ii) such visual depiction is of such conduct[.]

available three confirmed photographs depicting child pornography through
LimeWire's file-sharing software.  Agent Perez also testified that some, but not
all, of the other files made available for sharing on LimeWire's peer-to-peer
network had names known to be associated with child pornography.  Under these
circumstances, a prudent person would have concluded that there was a fair
probability that Sloan possessed child pornography on December 29, 2005.  As
such, his arrest was lawful.[16]

### 2.   *Sloan Voluntarily Consented to the Search of His Barracks Room, Locker, and Vehicle*

Voluntary consent to search constitutes a waiver of Fourth
Amendment rights.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 235 (1973).  Thus,
the government may conduct a search based upon an individual's voluntary
consent without a warrant and without probable cause, and any evidence
discovered within the scope of the consent may be seized and admitted at trial.
Because the court credits the testimony of Agent Wild that Sloan did in fact

---

[16] Given the finding of probable cause, the court need not reach the Government's
argument that the seizure, even if not supported by probable cause, was lawfully based on
reasonable suspicion.  The difficult issue is not whether the agents has reasonable suspicion that
Sloan committed an offense, but whether their actions in taking Sloan the short distance from the
kitchen to his barracks exceeded the legitimate goals of the detention.  Although agents may
physically move a suspect based on reasonable suspicion alone, they may do so only "when it is a
reasonable means of achieving the legitimate goals of the detention 'given the specific
circumstances' of the case."  *United States v. Charley*, 396 F.3d at 1080 (*quoting Gallegos v.
City of Los Angeles*, 308 F.3d 987, 991 (9th Cir. 2002)).

consent to the search of his barracks room, locker, and vehicle, the only issue that remains is whether that consent was voluntary.

Courts examine the totality of the circumstances surrounding the consent to determine whether it was given voluntarily.  *Id.* at 227.  The government must prove that the consent was voluntary by a preponderance of the evidence.  *United States v. Matlock*, 415 U.S. 164, 177 (1974).  The Ninth Circuit has identified the following five factors that courts should consider when determining whether consent to search was voluntary:  "'(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained.'"  *United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004) (*quoting United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002)).  Each case of consent should be examined on its own facts and no one factor is determinative of the issue of voluntariness.  *Id.*

First, Sloan was in custody when he gave consent to search. The circumstances of his seizure, however, do not indicate that the situation was unduly coercive.  The agents had probable cause to arrest Sloan, they did not threaten or order him, they did not draw their weapons (the second factor that the

17

court considers), they did not place him in handcuffs, and Sloan remained

cooperative throughout the encounter.  As to the third factor, Sloan was advised of

his *Miranda* rights and knowingly and voluntarily waived those rights.  Agent

Wild also specifically informed Sloan that he had a right to refuse consent (the

fourth factor).  This knowledge "is highly relevant in our analysis of whether

consent is voluntary."  *United States v. Meza-Corrales*, 183 F.3d 1116, 1125 (9th

Cir. 1999).  Finally, Sloan was not told that the agent could obtain (or had

obtained) a search warrant.

No evidence indicates that Sloan's will was overborne or that his

consent was anything but voluntary.  After weighing each of the five factors, the

court finds that Sloan voluntarily consented to the search of his barracks room,

locker, and vehicle.

The court now turns to the search of the Beaty home and seizure of

the computer.

### 3.    *Sloan Voluntarily Consented to the Search of the Beaty Home and the Seizure of His Computer*

During the search of Sloan's barracks room, Sloan told the agents that

his computer was located at the Beaty residence.  A short time later, at the CID

office, Agent Wild asked Sloan if agents could go to the Beaty residence and

"seize the computer as evidence" from that residence.  Sloan agreed.  Unlike the encounter at the barracks, Agent Wild failed to obtain a written consent to search.

First, the court credits the testimony of Agent Wild that Sloan gave oral consent to go to the Beaty residence to seize the computer.  Given this finding, the remaining determination is again whether the consent given was voluntary.

Little changed between the encounter at the barracks and the encounter at the CID office.  Once at the CID office, Agent Wild asked Sloan more questions regarding the Beaty residence and the location of the computer.  Sloan, remaining cooperative, answered the questions, telling Agent Wild where the computer was located, and how long he had been staying at the Beaty home.  Sloan then attempted to telephone the home without any success.  Agent Wild credibly testified that he then asked Sloan if he was willing to go to the Beaty residence, open the door, and permit the agents to "seize the computer as evidence."  Remaining cooperative, Sloan agreed.  Sloan remained fully cooperative during the search of the Beaty residence.

Again, weighing the non-exhaustive list of five factors, the court finds that Sloan voluntarily consented to the search of the Beaty home and to the seizure of his computer.  Although he was under arrest, the remaining factors

19

weigh heavily in favor of a finding of voluntariness.  The court therefore

concludes that the consent to search the Beaty residence and the consent to seize

his computer were voluntary and lawful.

   The court now addresses the final issue -- the scope of Sloan's

consent to search.

### 4. *Sloan Consented to the Search of His Computer for Evidence of Child Pornography*

   A consensual search may not exceed the scope of the consent given; a

search that exceeds its permissible scope also exceeds the bounds of the Fourth

Amendment.  The Supreme Court has established clear guidance in determining

the scope of consent:  "The standard for measuring the scope of a suspect's

consent under the Fourth Amendment is that of 'objective' reasonableness -- what

would the typical reasonable person have understood by the exchange between the

officer and the suspect?"  *Florida v. Jimeno,* 500 U.S. 248, 251 (1991).  In

reviewing the evidence, the court must look beyond the language of the consent

itself to the overall exchange between the agents and the suspect, which includes

contemporaneous statements and actions by the agents.  *Id.; United States v.

Marshall*, 348 F.3d 281, 286 (1st Cir. 2003).  Further, "[t]he scope of a search is

generally defined by its expressed object."  *Jimeno*, 500 U.S. at 251.

Sloan was well aware, shortly after he arrived at his barracks, that he was under investigation for the possession and/or distribution of child pornography.  The *Miranda* waiver form states that he is a suspect of "Possession, Distribution of Child Pornography."  Government Ex. 2.  It appears that Sloan placed his initials next to this statement.  *Id*.  The written consent to search form informed Sloan that he was under investigation for "Possession, distribution, and/or production of material constituting or containing child pornography. " Government Ex. 3.  This form stated that agents were seeking permission to search for a computer and computer related devices, along with "other data including deleted files and folders, containing materials related to the sexual exploitation of children."  *Id.*  In short, Sloan was clearly aware that he was under investigation for a child pornography offense, and that the agents were interested in obtaining his computer and computer data.  The agents' focus on his computer was made even clearer when Sloan was asked, during the search of his barracks room, where he kept his computer.

At the CID office, after Sloan admitted to possession of child pornography, Agent Wild asked him if the agents could go to the Beaty residence and "seize the computer as evidence."  Sloan agreed, remaining cooperative.  He placed no limit on the search, and directed the agents to the residence, opened the

door with his key, and then directed the agents to the computer.  During this entire

encounter, Sloan never limited the scope of his consent or objected to the seizure

of his computer.

Understanding that he was under investigation for the possession

and/or distribution of child pornography, and understanding that Agent Wild

wanted to obtain his computer, Sloan consented to the request to go to the Beaty

residence and seize his computer as evidence.  Under these circumstances, it was

objectively reasonable for the agents to conclude that the consent to seize the

computer included consent to search the computer's files for child pornography

after its seizure.  *See United States v. Al-Marri*, 230 F. Supp. 2d 535 (S.D.N.Y.

2002); *United States v. Morrison*, 2003 WL 24054501 (D.N.D. 2003).

Sloan was certainly aware that the investigation could only proceed if

the agents actually searched files on this computer.  The seizure of the computer,

without the concomitant ability to search the computer, would be a futile exercise

by the agents.  To hold otherwise would render meaningless the Supreme Court's

instruction that the "scope of a search is generally defined by its expressed object."

*Jimeno*, 500 U.S. at 251.[17]  The court concludes that Sloan's consent to seize the

---

[17] *United States v. Carey*, 172 F.3d 1268 (10th Cir. 1999), is distinguishable.  The Tenth
Circuit has recognized that *Carey's* holding should be limited to its facts -- where the defendant

(continued...)

computer included his consent to search the computer for evidence relating to the

possession and/or distribution of child pornography.[18]

### III.  CONCLUSION

For the reasons stated herein, Sloan's motion to suppress is DENIED.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, May 22, 2007.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*United States v. Sloan*, Cr. No. 06-00468 JMS, Order Denying Defendant's Motion to Suppress

---

[17](...continued)
and the officer were discussing a search for drugs, the defendant's subsequent consent to search his apartment did not permit a computer search for child pornography.  *United States v. Tucker*, 305 F.3d 1193, 1202 (10th Cir. 2002).  Here, Sloan and Agent Wild discussed the possession and/or distribution of child pornography, and Sloan's subsequent consent to seize the computer must be examined in that context.

[18] Given the court's rulings on the Fourth and Fifth Amendment claims above, the court need not address Sloan's claim that "the circumstances of the entire interaction between government agents and the defendant on February 15, 2006, were so overbearing as to constitute a free-standing due process claim under the Fifth Amendment."  Mot. to Suppress at 19.